The next matter, number 25-1734, Amro Farid v. Trustees of Dartmouth College. At this time, would counsel for the appellant please introduce himself on the record to begin. Good morning, Your Honors. Joseph Sullman for the Plaintiff Appellant Amro Farid. May I please have one minute for rebuttal to reserve? Yes, you may. We are asking the Court today to reverse the grant of summary judgment in favor of the defendant, Trustee of Dartmouth College, on all counts and remand. I will first discuss the claims of retaliation under federal and New Hampshire law under Counts 3 and 4. It is clear from the District Court's decision that the District Court did not consider significant evidence submitted in support of the claims of retaliation. The defendant does not appear to dispute this in its brief and only argues that the evidence does not support the denial of summary judgment in any event. While the evidence is significant that the District Court failed in granting summary judgment on the retaliation claims, there is significant evidence in support that the claims of retaliation was based on pretext. First, I will discuss how the investigation was biased. Evidence of bias is evidence of pretext under this Court's precedent. There is significant evidence that the investigation was biased. First and foremost, the investigation committee changed the scope of the research misconduct investigation halfway through. We have evidence that the director of research misconduct, excuse me, the vice provost, Dean Madden, told the investigation committee to keep the investigation limited to research misconduct. That was at the first meeting and that's also according to the research misconduct policy that it should be limited to research misconduct. Then halfway through, the committee decided, well, we know this is not research misconduct and the expert Mark Barnes was appointed and they expanded the scope well beyond research misconduct to include authorship disputes as well as allegations of retaliation. But I don't understand. An authorship dispute and a research misconduct dispute seem to be merged in my mind or at least could. It could be an authorship dispute or it could be I took your work and said it was mine and I declared myself the author. So I didn't follow why that was such a sort of a smoking gun expansion inconsistent with what the vice provost recommended in the beginning. Well, I don't necessarily consider a smoking gun, Your Honor, but the provost directed the committee, let's keep this limited research misconduct and other issues are for other matters. And under the research misconduct policy, it says this committee is limited to issues of research misconduct. There's an authorship policy. But couldn't an authorship dispute be research misconduct depending on what the underlying facts end up being? Those seem to merge into each other. A more benign one might end up as an authorship dispute. A worse one might end up as research misconduct because, again, I stole your work and I called it my own. And that's a continuum. And it seems to me this all kind of falls under was this guy not sharing authorship or was he stealing other people's work? Well, I understand that issues may overlap, but there are different policies to handle the different ones, Your Honor. And the research misconduct policy handles issues of research misconduct. And even defendant's own expert, Mark Barnes, agrees that authorship disputes are separate than research misconduct disputes. And a research misconduct dispute is a very specific thing. And an authorship dispute, even though issues overlap as issues in disputes often do, there's an authorship dispute policy that Dartmouth publishes that has a very specific provision. If it's an authorship dispute, you can talk to first the author about it, and the authors discuss it, and then if it doesn't, then you send it to the provost. But here they didn't do that. They went to the research misconduct investigation, which had a very specific mechanism about it, which ended up, it involves notice to the agency, the funding agency, which has reputational harm, of course, to the author, which an authorship dispute doesn't necessarily have. So that's why I believe that shows bias. They also refused to consider Professor Fareed's submission. When he submitted this long 300-page submission, he submitted that and he said, ask me if you have any questions. They just said, well, we don't understand it. Didn't they want to talk to him about that? He didn't want to talk about it, and so then they were left to kind of make the best of it that they could, and ultimately concluded that they didn't understand it, they didn't find it persuasive, so I'm not sure that they didn't consider it at all. Well, Your Honor, I believe the facts were slightly different. First, they had an interview process, and they asked the student to interview, he interviewed, then they asked Professor Fareed to interview, and he said, and he submitted a medical, because he was under a lot of stress, saying, I don't want to interview, but I'll submit to written questions. And then Director Froring, who's the Director of Research Integrity, didn't respond to that, even though in their depositions all the committee members said, I would have happily, we would have happily submitted written questions to him. But then when he submitted the written submission, he submitted it with saying, I'll happily answer any questions about this. And so that's what I'm getting at here, when he submitted that, he said, I'll answer any questions about this. But they didn't ask him any questions, they just said, well, we don't understand this. So that's why, but when the student, Prabhat Hegde, submitted information, they sent several rounds of questions by email. So by one hand, the student, who they sent several rounds of emails to with questions, when Professor Fareed sent something by writing, and invited questions, they didn't send him any questions. So that's a disparity right there. Yes, he didn't sit down for an interview, but he had a medical reason for doing that, and he said, I'll answer any written questions. Yeah, I'll submit for a written interview. They didn't respond to that. He sends a written submission, I'll answer any questions about that. They didn't respond to that. Counsel, I want to ask you about an issue that's in the district court's opinion. He writes a long footnote in which he, this is on the discrimination claim, questioning whether you've made out a prima facie case because the first adverse tenure decision, your client appealed that and was successful. There were procedural irregularities with it, and they vacated the tenure decision. Instead of taking advantage of that opportunity, arguably, he got a position at Stevens, which of course is quite good for him. Now, the district court also says the parties agree that you made the prima facie case. I'm going to ask your opponent why they agreed to that, but we're not bound by that agreement. It seems to me there's a serious problem here as to whether there was an adverse event here. The tenure decision was never finally decided. How do we overlook that? Well, I have to disagree with you. The tenure decision was final. There was a final tenure decision, and then he appealed it. If it was a recommendation... They vacated it. I understand that. There were these procedural irregularities, and in light of that, they vacated it. Then he could have reapplied for tenure. That option was available to him. I understand that. But under the case law, Your Honor, a final decision to deny tenure creates a cause of action. He has to then file tenure because that's a discriminatory event. If someone is denied a job and then they change that decision six months later because there's an internal grievance, that changes... There's a lot of law on that issue going back and forth. The district court cites a lot of that law in its footnote, but just to sort of sweep that under the rug and pretend that's not a critical issue strikes me as very odd. Well, we didn't brief that. I'm happy to brief it if the panel wants me to on a supplemental brief. I'm happy to because the district court didn't ask us to and my brother didn't challenge... Under Muldrow, there has to be some sort of change to the terms and conditions of his employment. What is the change to the terms and conditions of his employment that you're asserting? He was denied tenure. That was a change. He was denied tenure. That's a harm. He suffered emotional stress. So as your point, even if he gets a redo or he's entitled to a redo, he still got an initial adverse decision on his initial application. And even though that's not final, that still constitutes an adverse action under Muldrow? Yes, Your Honor, and it was final, but he appealed it, which is... Which he won. Yes, which he won, so it was final. Just because the employer that later rescinds it, it is still a final decision. So that is the issue. Just like if an employer fires you and then later decides, oh, we'll hire you back and repay you, the harm is still done. But the adverse action, the cause of action accrues at the time of the action, even if you file a grievance, even if you appeal it. Let me put it this way. He would not be able to later argue, no, my cause of action was told because I appealed it. That would not be a valid argument under this Court's precedent. So therefore, he can't now say, well, there's no cause of action because his cause of action accrued at the time of tenure. Counsel, just very quickly on the retaliation claim. Once the student filed the complaint against your client, weren't the Dartmouth officials required to initiate an inquiry as to whether there was some substance to that? And doesn't that significantly compromise the causation element? They had to do it. They had no choice. How is that obligation consistent with your argument that they invoked this procedure to retaliate against him for filing the EEOC complaint? Your Honor, under the policy, what they're required to do is to issue, sorry, not issue, to begin what's called a preliminary assessment. And this is clear under the policy. It's on page 477 of the appendix. The provost and the responsible dean have to see whether the allegations fall under the definition of research misconduct and are sufficiently credible and specific so that potential evidence of research misconduct might be identified. So the retaliation is not the assessment then. It's the determination of the assessment that we should go forward? Determination of that and then the fact that he did a biased investigation. The investigation is retaliation plus that they did it in such a biased manner to skew it against Professor Fareed. But isn't there enough in the record to suggest that there was merit to the complaint? In other words, there would have been no justification for them just to set it to the side and not continue investigating. There seemed to be something there and so they continued. That does seem to create a causation problem. I think there's enough in there for a jury to find it. There's also enough in there to say when the student cites the authorship policy in his email, there's also enough email in there for a jury to find it. He meant this as an authorship. All he wanted was an authorship by this. So I think there's enough for a jury to say both ways. And there's plenty in there for them to say even if there's enough, there's enough simply for the inquiry phase. At the inquiry phase, it's over. It's just internal. The key thing is when they went for an inquiry for a year, even though the inquiry under the policy is just supposed to be 60 days. They did an inquiry for one year. And then they found, they opened it to investigation, which is the key moment because that's when it goes to the agency. So that's when it goes beyond Dartmouth and goes to the agency. And an inquiry is nothing because an inquiry is just internal. It just stays quiet. And then they send it to the agency, the National Science Foundation. That's when they alert the publisher or they can alert the publisher. So that's when it becomes much bigger. And it's during that phase when the bias comes out. And that's when the bias investigation becomes critical. So it's not just opening the investigation, but turning it into a bias investigation, skewed against him. And we cite all that evidence. And I just went over that with you. So I'll go to my next minute. Thank you. Thank you, Counsel. At this time, would Counsel for the Appellee please introduce himself on the record to begin? Thank you, Your Honors. And may it please the Court, Attorney Pierre Chabot of the Law Firm of Divine Milliman. My colleague Stephen Zaharias is with me at Council table. I represent the Defendant Appellee Trustees of Dartmouth College. I'll turn to Judge Lopez's question first. The evidence on the discrimination claim, on its merits, was overwhelming in Dartmouth's favor. There really was no need to attack the prima facie case. I think that you'll see when you review the case law that's cited in the briefs, that inquiry has often collapsed. That's why we didn't address the inquiry of why the tenure denial was not a failure of the prima facie case. Okay, but you can argue on the alternative. That's done all the time. I mean, that's a pretty significant issue. I understand your confidence, but it at least troubles me that we don't have an ultimate determination on the issue of tenure. The decision was vacated. He could have reapplied. He chose not to do it. He chooses to go elsewhere, which is good for him. But that strikes me as a significant issue. And although the District Court, and that's a reasonable decision for the District Court made to overlook it, why should we feel bound by that agreement? I don't believe that you are bound to overlook it, Your Honor. You're putting me in a somewhat delicate position of having to argue against my own client's interests. But ultimately, when Professor Fareed goes up for tenure, a grant of tenure comes with a raise in salary, which he doesn't get, and it's not going to be retroactive if he gets it a year from now. So I think, ultimately, it is difficult for us to sit here and take the position that there is no adverse employment action. And again, I think... Because that adverse decision has a certain momentum, it would just make it more difficult for him to succeed later on? No, it's a year of lost wages. Even if he wins later... Yeah, it's going to be a year later. Assume he was discriminated against. In the intervening year, he lost money, because you're not going to pay him retroactively. They're not going to pay him back. When you get tenure, you get a raise. He didn't get tenure that first year, he didn't get a raise. So even if he went up the next year, and even if he succeeded... And it would have been unlikely to succeed, because again, Dartmouth decided the case on the merits. It decided the tenure case on the merits. It was very much a procedural issue, and not a troubling procedural issue that led to the reversal of tenure. The procedural issue was whether he could... understood that by failing, he was going to go to a terminal position, correct? Correct, correct. That's the gravamen of the review committee. And there's two different review committees, and I know the nomenclature is a little confusing. But the review committee decided that he wasn't notified clearly enough that this was a one-bite-at-the-apple proposition. So what do you make of the lead argument, which was this retaliation... Sorry, the research misconduct investigation was pre-taxed, because they bring in this guy Barnes, and then all of a sudden, you know, he's under a different microscope in contrast to what were the initial marching orders for the committee. So, Your Honor, I think you have the investigation committee minutes from at least a few of the months. And you have the deposition transcripts from the investigation committee members. I don't think the record bears out exactly what counsel was saying with respect to sort of changing their charge. I'll point to a few things that I have specific sites here for. You know, the investigation committee, it's obliged to examine authorship issues. And this was the testimony, I think, of Mr. Barnes. I don't want to get too far into detail, because it's in the sealed appendix, and Local Rule 11.0D makes this a little bit tricky. But if you look at the sealed appendix from pages 81 to 82, you know, I think the investigation committee specifically noted in its report how intertwined these issues are, as Your Honor noted in your questioning of my colleague. The investigation committee is, and this is in the appendix at 481, this is the research misconduct policy. They are charged with pursuing diligently all leads discovered, including additional instances of research misconduct, and to continue their investigation to completion. The investigation committee didn't go beyond its charge. You heard a mention of investigating retaliation. The investigation committee is permitted. First of all, Dartmouth is not permitted to sort of circumscribe what the investigation committee considers. It has a policy, it has rules, it provides those for the investigation committee. But what Dean Madden told them is what they are deciding, which is ultimately whether research misconduct occurred or not. They can consider a lot of other materials along the way to there. They can consider those materials, for example, for purposes of considering credibility. And the retaliation, just so I'm making clear what we're talking about, that is the allegation that in the process of sort of litigating the research misconduct, he sent a letter to the student that suggested that he would take legal action if the student didn't meet certain of his demands? Yeah, that was certainly one of the issues that most troubled the investigation committee, yes. And when you say retaliation, they investigated retaliation. Again, they didn't investigate retaliation. I think if you look at the final investigation committee report, they refer that. They find, they give the provost their findings. They give the provost the evidence that they discovered in the course of the proceedings, and they say this is a decision for you, provost, to determine. But that's something that came up in the course of their work. Yes, it is. It's something that the student specifically raised. Did they look at this, look at that issue as to credibility, essentially determining what they believed Mr. Freed did? I can't say that they looked at it that way. I think the rationale that was advanced to consider it is that that can show awareness of wrongdoing for purposes of the investigation committee's chart. I mean, they're charged with the finding. Does this cross the line between an authorship dispute, between colleagues in the same laboratory where you're simply denying somebody authorship you had promised, or does this rise to the level of stealing their ideas? Counsel, didn't the district court make a legal error in its causation analysis on the retaliation claim? I think it pointed out to the maybe five months between the filing of the EEOC complaint and the beginning of this research misconduct investigation. Basically it said five months is too long to support causation. That's, maybe it was a little less or more, but anyhow, to suggest that we have a fixed rule that that is too long, that's just, that's not our law. That's wrong, isn't it? Well, Your Honor, I think that the premise is incorrect. It would be wrong to take a categorical position, although the First Circuit has held numerous times that a four-month period would be insufficient to show a causal link. I don't think there's such a hard and fast rule, and I would agree with you there. I think what the circuit court was saying, there's approximately, there's one month between, I'm sorry, there's two months between the time that the EEOC, it's actually a New Hampshire Commission for Human Rights complaint is filed, and the student comes forward. And there's approximately three or four months from the time that the HRC complaint is filed until Dartmouth conducts its initial assessment and notifies the parties that it's going to proceed to an inquiry. That is one decision along the way, but I'm glad you asked this because, again, the inquiry panel is independent of the provost's office. I mean, they're faculty members, and in this case, they were faculty members of Dartmouth College, but by policy, by the research misconduct policies and procedures, they're granted a lot of latitude and independence from the provost's office and from the college, and they make an independent determination. So the initial assessment initially is Alexis Abramson, and it's actually Dean Madden first. Dean Madden receives the complaint from Alexis Abramson. He makes the assessment. He determines that this meets the definition of research misconduct if it's true, and it's sufficiently detailed and credible. And so he brings it to Alexis Abramson, who's the responsible dean. Alexis Abramson, I want to remind you of Theoden's holding, the Theoden versus Harvard case, because Theoden made it very clear, you look at these issues in the entire context, and that is actually something that Dartmouth very much urges you to do because Alexis Abramson had not recommended it against tenure, and Alexis Abramson had not done anything that I think could reasonably be ascribed to discrimination at this point in time. And so I think if you look at the entire record, the two people who decide that there's an initial assessment needed, Dean Madden, the record is undisputed, wasn't aware of any protected conduct. I think Alexis Abramson was aware of protected conduct. So this, I guess, gets to my question. So Dean Madden doesn't even know he goes up for tenure? Dean Madden is aware that there's some dispute, and that's all he's aware of. He doesn't know that there's been an EEOC complaint, that there's been a case of discrimination, that there's been anything that would qualify as protected conduct. He just understands it's a tenure dispute? I don't even know that it's a tenure dispute. I think the record is even less clear than that. He just knows that there's some dispute between the department and Fareed. Abramson supported him for tenure. Abramson neither supported nor, what she said is, I think he should get another year. She didn't support it or deny it. I mean, the faculty voted strongly against it. And what's the knowledge of the members of the inquiry committee of what's going on with him vis-a-vis tenure and his complaints? Your Honor, I don't believe that there's any record that the, I'm sorry, you asked about the investigation committee or the inquiry panel? The inquiry panel, I don't believe that there's any evidence in the record that the inquiry panel is aware of any protected conduct. And then they push it forward saying? They decide that, again, it meets the definition. If it's proven it's research misconduct and the report is sufficiently detailed and credible, it's basically akin to a probable cause. So that's an independent, that's an independent group. You know, there's some complication, if I may finish. There's some complication in completing the inquiry panel's work. It took a long time to find an inquiry panel. Dartmouth at all times, and the record does include this, Dartmouth at all times sought and got the extensions that its policy allows. But by the time the investigation committee takes over, I think that's what the district court was trying to say, Judge Lopez. That's well over a year later at this point. They're not controlled by, they're independent from the provost's office or anybody with any knowledge or information about the protected conduct, at least for the first part. And I will just say. But this just seems like an odd case to be using temporal proximity because this thing takes place over a very long period of time. There is the happenstance of when the student comes forward. But none of these dates really seem to matter if it's an ongoing sort of idea that we're going to use this long process to retaliate against him. So I'm not sure where temporal proximity really fits in this case as saying a certain number of months. I was trying to respond to Judge Lopez's question about what the district court ruled about temporal proximity. And I think the district court was analytically separating the decision to advance this from an assessment to an inquiry and from an inquiry to an investigation. But ultimately he doesn't rest on that, right? He rests on lack of pretext evidence? I think he correctly, I think, pointed out both grounds. That with respect to the so-called biased investigation which doesn't begin, as my colleague just pointed out, until well over a year after any protected conduct. It's hard to draw a line between the investigation, which again only happens after a separate inquiry panel has advanced the case, that any sort of alleged bias in the investigation could be tied back to any protected conduct. Your Honors, I'm well over my limit. May I make one more? Just comment about the record. The... My colleague, I think, made the point that... Forgive me. My colleague made the point that the investigation committee sort of changed scope in midstream once Attorney Barnes came on. And I'm sorry that I don't have the precise page and chapter and verse citation for you, but we did put in our brief, our only brief in this court, we did show the court the record where the investigation committee, and I believe this was deposition testimony from the members, but the investigation committee had reached a fairly clear-cut conclusion that what had occurred was research misconduct before the three-member committee resigned, disbanded, and had to be reconstituted. So I just want to point out that I think the record actually supports the opposite proposition. Attorney Barnes came on. Thank you. Thank you. At this time, would counsel for the appellant please reintroduce himself on the record. He has a one-minute rebuttal. Thank you. Joseph Solomon for the appellant and Plaintiff Emerald Freed. I just wanted to note for the court that my brother just read from the research misconduct policy and noted that the committee is charged with investigating issues related to research misconduct, not other issues. So that goes to my point earlier that the committee was expanding its scope by investigating other issues. Now, I understand their expert did testify in his deposition that it's common for these committees to investigate other issues, but that is their expert's opinion. That is contrary to what Dean Madden told the committee and what the policy says the committee is charged with doing. Now, on the issues of retaliation, the committee did investigate an allegation that Emerald Freed retaliated against the student in taking off authorship on a second paper. But again, that's another paper that was added to this investigation that Emerald Freed was never interviewed about. He was also never interviewed about this allegation of this email sent to the student. So this was all included in the final report. He was never interviewed about two additional issues, a second paper, and this allegation of retaliation that he was never interviewed about. Thank you.